IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FREEDOM DEFENSE
INITIATIVE; PAMELA GELLER; and
ROBERT SPENCER,

        Plaintiffs,

    -v.-

WASHINGTON   METROPOLITAN   AREA
TRANSIT AUTHORITY,

        Defendant.

Case No.  1:15-cv-01038-GK

MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT ........................................................................................................... 10

I.   SUMMARY JUDGMENT STANDARD .......................................................... 10

II.  PLAINTIFFS' SPEECH RESTS ON THE HIGHEST RUNG OF THE HIERARCHY OF FIRST AMENDMENT VALUES AND IS ENTITLED TO "SPECIAL PROTECTION" ........................................................................................ 11

III. PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR FREE SPEECH CLAIM ................................................................................ 12

    A.   WMATA's Prior Restraint on Protected Speech ................................... 12

    B.   Forum Analysis ................................................................................... 13

    C.   Application of the Appropriate Standard .............................................. 20

        1.   WMATA's Speech Restriction Is Content Based ..................... 20

        2.   WMATA's Speech Restriction Is Viewpoint Based ................. 24

        3.   WMATA's Speech Restriction Is Unreasonable ...................... 26

IV.  PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR EQUAL PROTECTION CLAIM ........................................................................ 29

V.   PLAINTIFFS CLAIMS FOR PROSPECTIVE DECLARATORY AND INJUNCTIVE RELIEF ARE NOT MOOT ........................................................................... 30

VI.  DEFENDANTS ARE LIABLE FOR VIOLATING THE CONSTITUTION ................. 34

CONCLUSION ........................................................................................................ 39

CERTIFICATE OF SERVICE ................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................10

*Air Lines Pilots Ass'n v. Dep't of Aviation*,
45 F.3d 1144 (7th Cir. 1995)..................................................................................25

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016)..........................................................................3, 32, 33

*Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*,
No. 2:14-5335, 2014 U.S. Dist. LEXIS 164575, (E.D. Pa. Nov. 25, 2014) ..................13

*\*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
898 F. Supp. 2d 73 (D.D.C. 2012) ..........................................5, 7, 11, 12, 13, 17, 25, 28

*Ben-Kotel v. Howard Univ.*,
319 F.3d 532 (D.C. Cir. 2003)................................................................................10

*Bible Believers v. Wayne Cnty.*,
805 F.3d 228 (6th Cir. 2015) ..................................................................................24

*Boos v. Barry*,
485 U.S. 312 (1988)................................................................................................22

*Brown v. Cal. Dep't of Transp.*,
321 F.3d 1217 (9th Cir. 2003) ................................................................................26

*Capitol Square Rev. & Adv. Bd. v. Pinette*,
515 U.S. 753 (1995)................................................................................................17

*Carey v. Brown*,
447 U.S. 455 (1980)..........................................................................................12, 30

*Carey v. Piphus*,
435 U.S. 247 (1978)..........................................................................................3, 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................10

*Chabad-Lubavitch of Ga. v. Miller*,
5 F.3d 1383 (11th Cir. 1993) ...............................................................................18

*Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*,
148 F.3d 242 (3d Cir. 1998)..................................................................................27

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)...............................................................................................31

*Cohen v. Cal.*,
403 U.S. 15 (1971).....................................................................................23, 24, 28

*\*Coleman v. Ann Arbor Transp. Auth.*,
947 F. Supp. 2d 777 (E.D. Mich. 2013)................................................................19

*Connick v. Myers*,
461 U.S. 138 (1983)...............................................................................................12

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*,
447 U.S. 530 (1980)...............................................................................................21

*\*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985).................................................................14, 15, 18, 21, 25 26

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*,
196 F.3d 958 (9th Cir. 1999) ................................................................................18

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
239 F.R.D. 9 (D.D.C. 2006)...................................................................................35

*\*Elrod v. Burns*,
427 U.S. 347 (1976)...............................................................................................30

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)...............................................................................................23

*\*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992).........................................................................................16, 22

*Freedman v. MCI Telecomm. Corp.*,
255 F.3d 840 (D.C. Cir. 2001) ..............................................................................10

*Glasson v. Louisville*,
518 F.2d 899 (6th Cir. 1975) ................................................................................24

*Gregoire v. Centennial Sch. Dist.*,
907 F.2d 1366 (3d Cir. 1990) ........................................................................................... 16

*Hague v. CIO*,
307 U.S. 496 (1939) ......................................................................................................... 14

*Headen v. Wash. Metro. Area Transit Auth.*,
741 F. Supp. 2d 289 (D.D.C. 2010) ................................................................................. 35

*Hill v. Colo.*,
530 U.S. 703 (2000) ......................................................................................................... 12

*Initiative & Referendum Inst. v. U.S. Postal Service*,
685 F.3d 1066 (D.C. Cir. 2012) ............................................................................. 3, 14, 33

*James v. Wash. Metro. Area Transit Auth.*,
649 F. Supp. 2d 424 (D. Md. 2009) .................................................................................. 35

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ......................................................................................................... 24

*Laningham v. U.S. Navy*,
813 F.2d 1236 (D.C. Cir. 1987) ....................................................................................... 10

*Lebron v. Wash. Metro. Transit. Auth.*,
749 F.2d 893 (D.C. Cir. 1984) ............................................................................... 9, 11, 37

*Lebron v. Wash. Metro. Area Transit Auth.*,
665 F. Supp. 923 (D.D.C. 1987) ........................................................................... 34, 35, 37

*Lewis v. Wilson*,
253 F.3d 1077 (8th Cir. 2001) ......................................................................................... 22

*Lucero-Nelson v. Wash. Metro. Area Transit Auth.*,
1 F. Supp. 2d 1 (D.D.C. 1998) ......................................................................................... 35

*Mo. v. Jenkins*,
491 U.S. 274 (1989) ......................................................................................................... 36

*Monell v. N.Y. Dep't of Social Servs.*,
436 U.S. 658 (1978) ................................................................................................... 35, 36

*Morris v. Wash. Metro. Area Transit Auth.*,
781 F.2d 218 (D.C. Cir. 1986) ......................................................................................... 37

*NAACP v. Button*,
371 U.S. 415 (1963) ........................................................................................................11

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ........................................................................................................11

*\*NAACP v. City of Phila.*,
39 F. Supp. 3d. 611 (E.D. Pa. 2014) ...............................................................................27

*\*NAACP v. City of Phila.*,
No. 15-1002, 2016 U.S. App. LEXIS 15431 (3d Cir. Aug. 23, 2016) ...........................28

*\*N.Y. Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998) .............................................................................13, 20, 30

*Newsome v. Norris*,
888 F.2d 371 (6th Cir. 1989) ..........................................................................................30

*Nieto v. Flatau*,
715 F. Supp. 2d 650 (E.D.N.C. 2010) .............................................................................15

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ........................................................................................................31

*People Against Police Violence v. City of Pitt.*,
520 F.3d 226 (3d Cir. 2008) ...........................................................................................32

*\*Perry Educ. Ass'n v. Perry Local Educators*,
460 U.S. 37 (1983) ..........................................................................................................14

*Pitt. League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
653 F.3d 290 (3d Cir. 2011) ...........................................................................................24

*Plater v. Dist. of Columbia Dep't of Transp.*,
530 F. Supp. 2d 101 (D.D.C. 2008) ................................................................................35

*Plyler v. Doe*,
457 U.S. 202 (1982) ........................................................................................................30

*\*Police Dept. of the City of Chi. v. Mosley*,
408 U.S. 92 (1972) ....................................................................................................21, 29

*R.A.V. v. St. Paul*,
505 U.S. 377 (1992) ........................................................................................................21

*Ridley v. Mass. Bay Transp. Auth.,
390 F.3d 65 (1st Cir. 2004)...................................................................................18, 19

Reno v. ACLU,
521 U.S. 844 (1997)...................................................................................................23

Rosenberger v. Rector & Visitors of the Univ. of Va.,
515 U.S. 819 (1995)...................................................................................................21

*Sammartano v. First Judicial Dist. Court,
303 F.3d 959 (9th Cir. 2002) .....................................................................................26

Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,
502 U.S. 105 (1991)...................................................................................................22

Se. Promotions, Ltd. v. Conrad,
420 U.S. 546 (1975)...................................................................................................16

S.O.C., Inc. v. Cnty. of Clark,
152 F.3d 1136 (9th Cir. 1998) ...................................................................................21

Stromberg v. Cal.,
283 U.S. 359 (1931)...................................................................................................11

Terminiello v. City of Chicago,
337 U.S. 1 (1949).......................................................................................................22

*True the Vote, Inc. v. I.R.S.,
Nos. 14-5316, 15-5013, 2016 U.S. App. LEXIS 14375 (D.C. Cir. Aug. 5, 2016).........................3

*United Food & Commercial Workers Union Local 1099 v. Sw. Ohio Reg'l Transit Auth.,
163 F.3d 341 (6th Cir. 1998) ................................................................................13, 16

*United States v. Griefen,
200 F.3d 1256 (9th Cir. 2000) ...................................................................................19

*United States v. W. T. Grant Co.,
345 U.S. 629 (1953)...................................................................................................31

Wash. Post Co. v. U.S. Dep't of Health & Human Servs.,
865 F.2d 320 (D.C. Cir. 1989)...................................................................................10

Will v. Mich. Dep't of State Police,
491 U.S. 58 (1989)................................................................................................35, 38

**Statutes**

42 U.S.C. § 1983................................................................................34, 35, 37, 38

42 U.S.C. § 1988..........................................................................................7, 36

**Regulations & Rules**

D.C. Code § 9-1107.01 ...................................................................4, 34, 37, 38

Fed. R. Civ. P. 25(d) .............................................................................................5

Fed. R. Civ. P. 56................................................................................................10

## INTRODUCTION

This case challenges Defendants' (collectively referred to as "WMATA") prior restraint on Plaintiffs' speech.  The principle issue presented is whether WMATA may target Plaintiffs' speech for censorship by issuing a temporary "moratorium" on the display of certain advertisements on its property *following the submission of Plaintiffs' ads* so as to prevent the display of these ads and then formalizing the censorship by way of a resolution that purportedly changed the regulations on advertising.[1]  As a result of the "moratorium" and resolution, WMATA has refused to display Plaintiffs' advertisements, and this refusal continues today.

As demonstrated below, the relevant facts and law compel the denial of Defendants' motion for summary judgment and the grant of this cross-motion.

On May 20, 2015, Plaintiffs submitted the advertisements at issue to WMATA's advertising agent for display on WMATA's buses and dioramas.  At the time of this submission, WMATA's advertising space was a public forum (which was the case for decades preceding the submission), and WMATA concedes that Plaintiffs' advertisements were compatible with the forum.  Yet, the ads were not accepted for display.

Because WMATA determined that it would not display Plaintiffs' advertisements, on May 28, 2015, WMATA's Board of Directors took the unprecedented, and quite hasty, step of approving a motion that "direct[ed] management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious, and advocacy advertising until the end of the calendar year."  As a result of this "moratorium," WMATA refused

---

[1] Contrary to WMATA's view (*see* Defs.' Mem. at 8-11 [arguing that Plaintiffs must amend their complaint for this Court to address the resolution]), the November 19, 2015 resolution is very much at issue in this litigation.  Not only is it the continuation of the constitutional harm caused initially by the temporary "moratorium," WMATA itself has introduced the resolution into this litigation, making it part of its motion for summary judgment and arguing that it is the basis for denying Plaintiffs any relief in this case.

to display Plaintiffs' advertisements.  WMATA subsequently amended its advertising guidelines on November 19, 2015, reaffirming the "moratorium" and thereby continuing to refuse to display Plaintiffs' advertisements.  As a result, the initial injury caused to Plaintiffs is ongoing.

As set forth more fully below, because WMATA's speech restriction is operating as a prior restraint, WMATA carries a _heavy burden_ of showing justification for the imposition of such a restraint—a burden which it has not, and cannot, carry.

Additionally, changes to a forum motivated by discrimination against a speaker or her message, as in this case, are impermissible under the First Amendment.  Consequently, because the purpose and effect of WMATA's "moratorium" and subsequent modification of its advertising guidelines were designed to prevent Plaintiffs' disfavored speech, the federal courts are capable of taking prompt and measurably appropriate action to remedy this First Amendment violation. Indeed, the "moratorium" and resolution, facially and as applied, violate the First Amendment.

Pursuant to clearly established First Amendment jurisprudence, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury sufficient to warrant this Court granting injunctive relief.  And pursuant to controlling law, the voluntary cessation of illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways.  Consequently, along with its power to hear the case, the Court's power to grant injunctive relief survives discontinuance of the challenged conduct.

To establish mootness by reason of its change in conduct, _WMATA must show_ (1) that there is no reasonable expectation that the conduct will recur and (2) that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.  WMATA's burden of

establishing these criteria is a "heavy" one.[2]   *See True the Vote, Inc. v. I.R.S.*, Nos. 14-5316, 15-5013, 2016 U.S. App. LEXIS 14375 (D.C. Cir. Aug. 5, 2016).   WMATA has not, and cannot, carry this burden.

Finally, Plaintiffs, at a minimum, are entitled to nominal damages for the past loss of their constitutional rights as a matter of law.   *See, e.g., Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). In their moving papers, WMATA fails to note that while injunctive relief was ultimately denied in *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, 815 F.3d 105 (2d Cir. 2016), the district court did "enter[] partial final judgment finding the MTA liable for nominal damages" for violating Plaintiffs' First Amendment rights.   *Id.* at 109.   And the "estoppel effect of the district court's partial judgment on damages" was a significant factor in the Second Circuit's conclusion that injunctive relief was no longer necessary.   *Id.* at 110.

In sum, WMATA seeks to escape all liability for violating Plaintiffs' fundamental right to free speech.   This Court should reject such a proposition, which would leave the government free to violate the First Amendment with impunity by issuing hasty "moratoriums" to prevent disfavored speech.   The First Amendment demands greater respect.

## STATEMENT OF FACTS

Plaintiffs Geller and Spencer are co-founders of Plaintiff American Freedom Defense Initiative ("AFDI"), which is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.   Plaintiff Geller is the President of AFDI, and Plaintiff Spencer is the Vice President.   (Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment at ¶¶ 1-2 [hereinafter "SMF"]).

---

[2] As set forth more fully in the following text, WMATA's reliance on the Second Circuit's decision in *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, 815 F.3d 105 (2d Cir. 2016), and the D.C. Circuit's decision in *Initiative and Referendum Institute v. United States Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012), to argue that this case is moot (*see* Defs.' Mem. at 5-7) is misplaced.

AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.  It achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the First Amendment.  (SMF at ¶¶ 3-4).

AFDI exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including Washington, D.C.  AFDI purchases these advertisements to express its message on current events and public issues, including issues involving the suppression of free speech by complicit government officials (hereinafter referred to as "AFDI's advertising campaign").  (SMF at ¶¶ 5-6).

Plaintiffs Geller and Spencer engage in protected speech through AFDI's activities, including AFDI's advertising campaign.  (SMF at ¶ 7).

WMATA is a government agency that was established through a congressionally approved interstate compact to provide public transportation in the Washington D.C. metropolitan area.  *See* D.C. Code § 9-1107.01 ("WMATA Compact").  One way in which WMATA raises revenue is by leasing the advertising space on its property.  (SMF at ¶¶ 8-17).

Section 80 of the WMATA Compact provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function."  D.C. Code § 9-1107.01(80).  WMATA's leasing of its advertising space is a proprietary function.  (*See* SMF at ¶¶ 18-19).

Jack Requa was the Interim General Manager and Chief Executive Officer of WMATA at the time this action was filed.  He was subsequently replaced by Paul J. Wiedefeld, who is now the permanent General Manager and Chief Executive Officer for WMATA.[3]  (SMF at ¶ 20).[4]

The General Manager and Chief Executive Officer for WMATA is responsible for enforcing the acts, policies, practices, and/or customs of WMATA, including the restriction on Plaintiffs' speech at issue here.  (SMF at ¶ 21).

As a government agency, WMATA is mandated to comply with the First and Fourteenth Amendments to the Constitution.  *See, e.g., Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73 (D.D.C. 2012) (granting injunction for violating the First Amendment) (hereinafter "*AFDI v. WMATA I*"); (SMF at ¶ 22).

WMATA leases space for advertising on its Metrobuses and free-standing dioramas inside its subway stations.  (SMF at ¶ 9).

According to WMATA's website:

> Metro provides a unique opportunity to reach the out-of-home market in the Washington metropolitan area.  The Metrobus and Metrorail system covers all of the District of Columbia and the suburbs of Maryland and Northern Virginia. Exterior bus advertising penetrates 90% of the daily population and makes multiple impressions all over the region, throughout business districts, residential areas, and tourist attractions.  Advertising in the Metrorail system provides an opportunity to target business executives, federal employees, students, and tourists.  Advertising displays are available on the sides, backs, and interiors of Metrobuses.  In the Metrorail system, backlighted advertising displays and two-sheet poster displays are available in Metro stations.  Advertising space is also available inside rail cars.

(SMF at ¶ 10).

---

[3] Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Mr. Wiedefeld is, as the successor to Mr. Raqua, automatically substituted as a party.  Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party.").

[4] (*See also* http://www.wmata.com/about_metro/general_manager/index2.cfm).

On <u>May 20, 2015</u>, Plaintiffs submitted to WMATA's advertising agent for display on WMATA's buses and dioramas the advertisements at issue here.  As part of this submission, Plaintiffs stated that they "wish to submit the following ad to run on 20 Washington DC buses and 5 DC Dioramas including Foggy Bottom, Capitol South, Bethesda, L'Enfant Plaza, Shady Grove and Union Station (if available)."  (SMF at ¶¶ 23-26).

The proposed ad for display on WMATA's buses appears as follows:



(SMF at ¶ 24).

The proposed ad for display on WMATA's dioramas appears as follows:



(SMF at ¶ 25).

On <u>May 22, 2015</u>, WMATA's advertising agent responded to Plaintiffs' submission request, stating, in relevant part, "The copy has been submitted to the transit authority.  We are

also looking into available inventory.  I will let you know about both as soon as I hear back."
(SMF at ¶¶ 26, 27).

At the time Plaintiffs submitted their advertisements, WMATA leased its space for a wide array of political, religious, public-issue, public-service, and commercial advertisements, including advertisements expressing controversial views and addressing controversial issues. (SMF at ¶¶ 11, 13, 16, 28, 31, 32).

For example, WMATA has leased its advertising space for advertisements that criticize Israel and Jews, including an advertisement that sought to "End U.S. military aid to Israel." WMATA has also displayed advertisements submitted by the Council on American-Islamic Relations (CAIR), promoting CAIR's views on Islam and the Quran.  (SMF at ¶¶ 29-30).

Consequently, at the time Plaintiffs submitted their advertisements, WMATA's advertising space was indisputably a public forum for Plaintiffs' speech.  *See AFDI v. WMATA I*, 898 F. Supp. 2d at 78-79 ("Since WMATA conceded that it provides a public forum for advertising, the Court considers that aspect of the standard satisfied.").  (SMF at ¶¶ 28-32).  And there was known availability at that time for the placement of Plaintiffs' ads.  (SMF at ¶ 33).  Thus, there was "_no reason to reject_" the ads.[5]  (SMF at ¶¶ 32, 57).

Because WMATA determined that it would not display Plaintiffs' advertisements, on May 28, 2015, WMATA's Board of Directors took the unprecedented step of approving a motion that "directs management to close WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious, and advocacy advertising until the end of the calendar year."  (SMF at ¶¶ 34-47, 50-54).

---

[5] In 2012, WMATA tried to delay the display of Plaintiffs' advertisement, but this Court held that the delay violated Plaintiffs' First Amendment right to freedom of speech and enjoined WMATA's speech restriction. (SMF at ¶ 48); *AFDI v. WMATA I*, 898 F. Supp. 2d at 83, 84.  WMATA settled the claim for attorneys' fees advanced pursuant to 42 U.S.C. § 1988 by agreeing to pay Plaintiffs' counsel $35,000.  (SMF at ¶ 49).

The submission of Plaintiffs' advertisements was the moving force that prompted WMATA to draft and approve this motion so that Plaintiffs' ads would not run.  Indeed, contemporaneous with the submission of Plaintiffs' ads, WMATA prepared a memorandum that suggested a change in policy that would restrict Plaintiffs' ads.  Additionally, prior to suggesting a policy change, the then-WMATA Board Chairman, Mr. Mort Downey, sent an email to Ms. Lynn M. Bowersox, the assistant general manager for customer service, communications, and marketing, regarding Plaintiffs' ads, in which Mr. Downey is reacting to a news article about the ads and directs Ms. Bowersox to be prepared to discuss the matter with the Board on May 28, to which Ms. Bowersox responded, "we are."  (SMF at ¶¶ 34-36, 38).

The WMATA Board held an executive session on May 28, 2015 (the first opportunity following the submission of Plaintiffs' ads), to consider for the first time and to put in place the "moratorium."  Despite the unprecedented nature of the "moratorium" and its negative impact on revenue, the proposal was made verbally, with little discussion.  While no formal vote is taken at an executive session, there appeared to be a consensus among the members at the time that the motion would pass during the open meeting.  (SMF at ¶¶ 37-41, 52).

During the May 28, 2016 Board meeting, the motion was raised as the last item.  This unprecedented proposal was not on the Board's agenda for the meeting that evening; therefore, there were no public comments nor discussion about it.  The Board voted unanimously to approve the motion, despite appearing confused by its procedural propriety.[6]  (SMF at ¶¶ 44, 46-47).

---

[6] The proposed motion disclosed during discovery had printed on it "Approved Unanimously May 22, 2015," yet the meeting to consider the motion was not scheduled to take place until May 28, 2015.  (SMF at ¶ 51).

Prior to approving the motion, WMATA had no specific information that the display of Plaintiffs' ads would result in disruption or violence directed at WMATA, its property, or its passengers.  (SMF at ¶ 45).

The approval of this unprecedented "moratorium" fundamentally altered (temporarily) the way WMATA had been doing business for many decades.  *See, e.g., Lebron v. Wash. Metro. Area Transit Auth.,* 749 F.2d 893 (D.C. Cir. 1984); (SMF at ¶ 53).

Following the approval of the "moratorium," on November 19, 2015, the WMATA Board of Directors passed a resolution stating, *inter alia,* "9.  Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."; "11.  Advertisements that support or oppose any political party or candidate are prohibited."; "12. Advertisements that support or oppose any religion, religious practice or belief are prohibited."; and "13.  Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertisers are prohibited."  (SMF at ¶ 55).

There are no objective criteria for determining whether an ad should be accepted or rejected under the WMATA guidelines.  Rather, WMATA applies a "case-by-case" approach.  (SMF at ¶¶ 55, 61).

Plaintiffs want to display their advertisements on WMATA property, and wanted to do so when the ads were originally submitted, but WMATA refuses to do so, causing Plaintiffs irreparable harm.  Indeed, WMATA rejected, and continues to reject, Plaintiffs' ads because WMATA claims (rather ironically) that the ads "advocate[] free speech."  (SMF at ¶¶ 57-60).

**ARGUMENT**

## I.   SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When considering a summary judgment motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255; *see also Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

On a motion for summary judgment, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.  To defeat summary judgment, the non-moving party must have more than "a scintilla of evidence to support [its] claims." *Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001); *see Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003).

Since this response also serves as Plaintiffs' cross-motion for summary judgment, Plaintiffs and Defendants are both moving and non-moving parties for purposes of this Court's review.

## II.   PLAINTIFFS' SPEECH RESTS ON THE HIGHEST RUNG OF THE HIERARCHY OF FIRST AMENDMENT VALUES AND IS ENTITLED TO "SPECIAL PROTECTION."

We begin our substantive argument with an indisputable assertion: The First Amendment protects Plaintiffs' right to freedom of speech from infringement by government actors such as WMATA and its officials.  *AFDI v. WMATA I*, 898 F. Supp. 2d at 76 ("WMATA . . . . does not deny that it is a government actor to which the First Amendment applies."); *see also Lebron v. Wash. Metro. Area Transit Auth.,* 749 F.2d 893*,* 896 (D.C. Cir. 1984) (holding that WMATA violated the First Amendment by rejecting an ad).  Thus, the proper context for the case is this: The government (WMATA) is asking the Court to sanction actions which have silenced speech that is fully protected by the First Amendment based on its content (and, indeed, viewpoint).

Given the important First Amendment context of this case, it is essential to recall that the U.S. Supreme Court has long recognized that the freedom of speech is a fundamental right that is essential to our republican form of government.  As the Court noted, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citations omitted); *see also Stromberg v. Cal.,* 283 U.S. 359, 369 (1931) (observing that "free political discussion" is "essential to the security of the Republic" and "a fundamental principle of our constitutional system").  And this is particularly true when the speaker is wishing to express an "issue-oriented" message in Washington, D.C.— "the seat of the federal government."  (SMF at ¶ 12).

Indeed, Plaintiffs' speech in the form of their advertisements makes the point that our First Amendment freedoms, which are "delicate and vulnerable," as this case aptly demonstrates, *see NAACP v. Button*, 371 U.S. 415, 433 (1963) (observing that our First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society"), will not yield to those who

want to enforce so-called blasphemy laws (*i.e.*, prohibitions on speech mandated by Islamic law), whether through threats of violence or through the actions of complicit government officials who willingly yield to political correctness.  WMATA's actions confirm the critical importance of this message and demonstrate the bitter irony of this case (*i.e.*, the "issue" WMATA wants to censor here is "free speech").  (*See* Bowersox Dep. at 108:12-15 at Ex. 2 ["But I believe that this ad would come under advocacy because it advocates free speech and it does not try to sell you a commercial product."]).

In *Connick v. Myers*, 461 U.S. 138 (1983), the Court noted that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."  *Id.* at 145 (quoting *Claiborne Hardware Co.*, 458 U.S. at 913 (1982) & *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Because WMATA unlawfully censored Plaintiffs' speech—speech which is entitled to "*special protection*"—Plaintiffs are entitled to judgment in their favor as a matter of law.

## III.   PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR FREE SPEECH CLAIM.

A free speech claim is typically examined in three steps.  First, the Court must determine whether the speech in question—Plaintiffs' "Support Free Speech" advertisements—is protected speech.  Second, the Court must conduct an analysis as to the forum in question to determine the proper constitutional standard to apply.  And third, the Court must then determine whether the speech restriction comports with the applicable standard.  *See, e.g., AFDI v. WMATA I*, 898 F. Supp. 2d at 78-79 (applying three-step analysis).

### A.   WMATA's Prior Restraint on Protected Speech.

As noted above, the first question is easily answered.  Conveying a "free speech" message with signs constitutes speech protected by the First Amendment.  *See Hill v. Colo.*, 530 U.S. 703,

714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."). This includes signs posted on the advertising space of government transit authorities such as WMATA. *See AFDI v. WMATA I,* 898 F. Supp. 2d at 79 (concluding that the proposed advertisement was protected speech); *Lebron,* 749 F.2d at 896 (same); *N.Y. Magazine v. Metro. Transp. Auth.,* 136 F.3d 123, 130 (2d Cir. 1998) (same); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (same) (hereinafter "*United Food*"); *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.* ("SEPTA"), No. 2:14-5335, 2014 U.S. Dist. LEXIS 164575, at *8 (E.D. Pa. Nov. 25, 2014) ("[T]he advertisement at issue here is exactly the sort of political expression that lies at the heart of the First Amendment.").

Moreover, WMATA's restriction on Plaintiffs' speech operates as a prior restraint. *Lebron,* 749 F.2d at 896 (holding that the refusal to display the poster "because of its content is a clear cut prior restraint"). Consequently, "WMATA carries a heavy burden of showing justification for the imposition of such a restraint." *Id*. (internal quotations and citation omitted); *AFDI v. WMATA I*, 898 F. Supp. 2d at 79 ("WMATA imposed a prior restraint because it prevented Plaintiffs from displaying their ad in WMATA stations; a prior restraint 'bear[s] a heavy presumption against its constitutional validity.'") (citation omitted).

In sum, WMATA's prior restraint on Plaintiffs' protected speech "bears a heavy presumption against its constitutional validity." WMATA has not, and cannot, carry the "heavy burden of showing justification for the imposition of such a restraint."

### B.   Forum Analysis.

"The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes." *Cornelius v. NAACP*

*Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided

government property into three general categories: traditional public forums, designated public

forums, and nonpublic forums.[7]  *Cornelius,* 473 U.S. at 800.  Once the forum is identified, the

court must then determine whether the speech restriction is justified by the requisite standard.  *Id.*

On one end of the spectrum lies the traditional public forum.  Traditional public forums,

such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the

use of the public and, time out of mind, have been used for purposes of assembly, communicating

thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515

(1939).  This forum is not implicated here.

Next on the spectrum is the designated public forum, which exists when the government

intentionally opens its property for expressive activity.  *Perry Educ. Ass'n v. Perry Local*

*Educators*, 460 U.S. 37, 44 (1983).  As the Supreme Court stated, "[A] public forum may be

---

[7] The courts have also referred to a "limited public forum."  However, as WMATA notes in its memorandum, nonpublic and limited public forums are often used interchangeably since the same standard is typically applied to both.  (*See* Defs.' Mem. at 10, n.1).  Unfortunately, this blurred and confused distinction, which results in the blending of the two forums, is a mistake, and it operates in a way that favors the government and disfavors the First Amendment.  For example, a federal courtroom is clearly a nonpublic forum—its characteristics are significantly different and thus distinguishable from a government transit authority's advertising space in which the government allows some private speakers but prohibits others based on the message they are conveying (here, for example, WMATA is trying to exclude speech which is entitled to "special protection" ["issue-oriented" speech] in favor of speech that has less political importance ["commercial" speech]).  To argue that the two forums should be treated the same under the law is to treat the First Amendment as a simple inconvenience for the government rather than a fundamental liberty interest that is the foundation of our constitutional Republic.  A limited public forum (a forum in which the government allows some speech), such as a transit authority's advertising space, should be treated as a subcategory of a designated public forum, applying that heightened standard, rather than as a nonpublic forum in which free speech takes a back seat (on the metro bus, to complete the metaphor).  Consider further the situation involving interior postal sidewalks at issue in *Initiative and Referendum Institute v. United States Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012).  There, the court held that the sidewalks were a nonpublic forum.  However, it is implausible to argue that the government could permit someone to use those sidewalks to solicit a sale of goods (commercial speech) but not solicit signatures for a referendum (political speech), demonstrating further why WMATA's advertising space should be treated as a public forum.

created by government designation of a place or channel of communication for use by the public at large for assembly and speech, *for use by certain speakers*, or for the discussion of certain subjects."[8] *Cornelius*, 473 U.S. at 802 (emphasis added).

A designated public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To discern the government's intent, courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id*. In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny. *Id*. at 800 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . . Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest.").

At the opposite end of the spectrum is the nonpublic forum. The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for *public communication*." *Perry Educ. Ass'n,* 460 U.S. at 46 (emphasis added). In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id*. Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id*.; *see e.g., Nieto v. Flatau*, 715

---

[8] Note that under this definition, a government transit authority's advertising space, which is open to *certain speakers* (*i.e.*, those who are willing to pay for advertisements), is a designated public forum. *See also supra* n. 7. Thus, to distinguish based on content (permitting commercial messages but prohibiting "issue-oriented" messages), requires the government to satisfy strict scrutiny. The government could convert the designated public forum into a nonpublic forum by shutting down <u>all</u> speech, but that is not what WMATA is trying to do here.

F. Supp. 2d 650 (E.D.N.C. 2010) (holding that a speech restriction on a military base, a nonpublic forum, was viewpoint based as applied to anti-Islam speech in violation of the First Amendment).

Moreover, as the Supreme Court warned, "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Consequently, "the definition of the standards for inclusion and exclusion must be unambiguous and definite." *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1375 (3d Cir. 1990). And the reason for this is evident: "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food*, 163 F.3d at 359; *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view."). Consequently, a speech restriction "offends the First Amendment when it grants a public official unbridled discretion such that the official's decision to limit speech is not constrained by *objective* criteria, but may rest on 'ambiguous and subjective reasons." *United Food*, 163 F.3d at 359 (internal quotations and citation omitted) (emphasis added).

Here, WMATA's "moratorium" and subsequent guidelines are hopelessly vague, particularly as applied to Plaintiffs' ads. What precisely is an "issue-oriented" ad? The "issue" presented by Plaintiffs' ads is "*Support Free Speech.*" But all advertising is free speech at some level. And would WMATA permit an advertisement from Plaintiffs that just included the cartoon, which was the winning entry of an art contest sponsored by Plaintiffs? If not, why not?[9]

---

[9] The revised guidelines permit ads "promoting contests." (Bowersox Aff. ¶ 5, Ex. B ["2. Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations."]).

In sum, WMATA's unbridled control over the use of the forum at issue here (WMATA's advertising space) does not meet the standard required by the First Amendment. On their face, the "moratorium" and the revised guidelines do not satisfy First Amendment safeguards, which alone is a reason for granting judgment in Plaintiffs' favor.[10] As WMATA concedes, there are no objective criteria for determining whether an ad should be accepted or rejected under the guidelines. Rather, WMATA applies a "case-by-case" approach. (SMF at ¶¶ 55, 61).

Nonetheless, at the time Plaintiffs' ads were submitted for display, there is no dispute that WMATA's advertising space was a public forum for Plaintiffs' speech. *See Lebron,* 749 F.2d at 896 (holding that there is no "question that WMATA has converted its subway stations into public fora by accepting other political advertising"); *AFDI v. WMATA I*, 898 F. Supp. 2d at 78-79 ("Since WMATA conceded that it provides a public forum for advertising, the Court considers that aspect of the standard satisfied.").

And as argued above, even with the "moratorium" and subsequent resolution, the forum properly remains a public forum such that WMATA's restriction on Plaintiffs' speech (*i.e.*, its decision to exclude Plaintiffs' speech) must survive strict scrutiny, which it cannot, and WMATA doesn't argue that it could.

Furthermore, it is generally true that the government has an inherent right to control its property, which, depending upon the facts and circumstances, *may* include the right to *close* a previously open forum. *See, e.g., Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 783-84 (1995) ("The fact that the capitol lawn has been the site of public protests and gatherings, and is the location of any number of the government's own unattended displays . . . does not disable

---

[10] For example, pursuant to the guidelines, "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited." (Bowersox Aff. ¶ 5, Ex. B [Doc. No. 19-3]). This restriction, *inter alia*, is not constrained by objective criteria by any man's measure.

the State from closing the square to *all* privately owned, unattended structures.") (Souter, J., concurring in the judgment) (emphasis added); *Cornelius*, 473 U.S. at 802 (observing that "the government is not required to indefinitely retain the open character of the facility") (internal quotations and citation omitted); *see also Perry*, 460 U.S. at 46 ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum.").  For example, closing the forum has been held to be a permissible solution to the problem caused by concerns about providing equal access while avoiding the appearance of government endorsement of religion, which could raise potential Establishment Clause issues for the government.  *See Chabad-Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1394 (11th Cir. 1993) (en banc) ("If Georgia fears that it would violate the Establishment Clause by allowing the [religious] display, it can avoid the perception that it is endorsing a religion by . . . closing the [public] forum altogether . . . ."); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 970 (9th Cir. 1999) ("Closing the forum is a constitutionally permissible solution to the dilemma caused by concerns about providing equal access while avoiding the appearance of government endorsement of religion.").  Suffice to say, there are no Establishment Clause concerns at issue here, nor has WMATA closed the forum to *all* speech—the forum remains open for some advertising based upon its content and/or viewpoint.

Thus, it is incorrect to conclude that the government's discretion to close a forum for protected speech (particularly when it remains open for commercial speech) is without constitutional limits.  In *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65, 77 (1st Cir. 2004), for example, a case involving the display of advertisements on property controlled by the MBTA, the court noted that "[t]he government is free to change the nature of any nontraditional forum as it wishes.  *Cornelius*, 473 U.S. at 802.  Thus, even if MBTA's previous

intent was to maintain a designated public forum, it would be free to decide *in good faith* to close the forum at any time." *Ridley*, 390 F.3d at 77. The court proceeded to find that "[t]here is *no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements*," concluding as follows: "To the contrary, the MBTA acted *in response to expressed constitutional concerns* about its prior guidelines, and cannot be faulted for trying to adhere more closely to the constitutional line. And if the MBTA revised a guideline *merely as a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created*." *Id*. (emphasis added).

Here, WMATA didn't issue its "moratorium" or adopt new guidelines in response to any expressed constitutional concerns. Rather, WMATA acted in response to the submission of Plaintiffs' advertisements, as evidenced by the timing of the "moratorium," the circumstances surrounding the "moratorium," and the haste with which the "moratorium" was passed by WMATA's Board of Directors. (*See, e.g.*, SMF at ¶ 34 [testifying that the submission of Plaintiffs' ads was the "straw that broke the camel's back"]).

The court in *Coleman v. Ann Arbor Transportation Authority*, 947 F. Supp. 2d 777 (E.D. Mich. 2013), echoed the point Plaintiffs are making here: "It is true that changes to a forum motivated by actual viewpoint discrimination may well limit the government's freedom of action." *Id*. at 788. And as the Ninth Circuit observed in *United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000), "Should it appear that the true purpose of . . . an order [closing a forum] was to silence disfavored speech or speakers, or that the order was not narrowly tailored to the realities of the situation, or that it did not leave open alternative avenues for communication, the federal courts are capable of taking prompt and measurably appropriate action."

In other words, even assuming, *arguendo*, that WMATA lawfully closed the forum to Plaintiffs' speech via its "moratorium" and then reaffirmed the closure by way of its resolution, the evidence supports the conclusion that WMATA's actions were motivated by an animus toward Plaintiffs' speech such that a "prompt and measurably appropriate action" for this Court would be to grant judgment in Plaintiffs' favor and issue the requested injunction. *Perry Educ. Ass'n,* 460 U.S. at 46 (observing that the government "may reserve the forum for its . . . purposes . . . as long as the regulation on speech is . . . *not an effort to suppress expression merely because public officials oppose the speaker's view*") (emphasis added).  Indeed, it would hardly be equitable to permit the government to avoid an injunction protecting a party's First Amendment right to freedom of speech based on actions taken by the government designed to suppress the very speech at issue, which is precisely what has happened in this case.  As stated by the Second Circuit, "[I]t cannot be true that if the government excludes any category of speech from a forum through a rule or standard, that forum becomes *ipso facto* a non-public forum, such that we would examine the exclusion of the category only for reasonableness.  This reasoning would allow every designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content."  *N.Y. Magazine*, 136 F.3d 129-30.

C.   **Application of the Appropriate Standard.**

1.   **WMATA's Speech Restriction Is Content Based.**

In a designated public forum (which, as Plaintiffs demonstrate here, is the proper characterization of the forum at issue with or without the new regulations), similar to a traditional public forum, the government's ability to restrict speech is sharply limited.  The government may enforce reasonable, content-neutral time, place, and manner regulations of speech if the regulations

are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.  *Perry Educ. Ass'n,* 460 U.S. at 45.  However, content-based restrictions are subject to strict scrutiny.[11]  *Cornelius*, 473 U.S. at 800.  That is, content restrictions are only permissible when they are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that interest." *Id.*  For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992) (stating that the government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed"); *see Police Dept. of the City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) (holding that the government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express more controversial views).  Consequently, content-based restrictions "are presumptively unconstitutional."  *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998).

To determine whether a restriction is content based, the courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consolidated Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980).  Here, the restriction is, at a minimum, content based because WMATA restricted Plaintiffs' speech based on the belief that the speech conveyed an "issue-oriented" message.  In reality, WMATA was concerned that others might be offended by Plaintiffs' message.[12]  However, such concerns are not a legitimate basis for

---

[11] Any argument that WMATA was simply imposing a "time" restriction—*i.e.*, a temporary "moratorium"—is unavailing because the restriction is nonetheless subject to strict scrutiny because it was adopted to reject certain messages (specifically including Plaintiffs' message) based on content.

[12] WMATA demonstrates this point in its memorandum by conceding that it relied on adverse public comments as the basis for rejecting "issue-oriented" advertising.  (Defs.' Mem. at 10 [citing results of

suppressing Plaintiffs' speech.  The Supreme Court has long held that a listener's (or, in this case, a viewer's) reaction to speech is not a content-neutral basis for regulation.  *Forsyth Cnty.* 505 U.S. at 134.  "The First Amendment knows no heckler's veto."  *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001).  While restrictions on speech because of the "secondary effects" that the speech creates are sometimes permissible, an effect from speech is not secondary if it arises from the content of the speech or the viewpoint of the speaker.  "The emotive impact of speech on its audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.).

> In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), the Supreme Court famously stated,
>
> [A] function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech . . . is . . . protected against censorship or punishment. . . . There is no room under our Constitution for a more restrictive view.

*Id*. at 4.  Therefore, the fact that Plaintiffs' speech may actually offend some people does not lessen its constitutionally protected status; it enhances it.  "The fact that society may find speech offensive is not a sufficient reason for suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."  *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted); *Forsyth Cnty.,* 505 U.S. at 135 (noting that speech cannot be "punished or banned, simply because it might

---

"review" conducted by WMATA and relying upon the opinions of those who oppose "issue-oriented" ads]; *see also id*. at 10 [citing the "controversy frequently generated by issue-oriented advertisements" and "the fact that transit patrons are in close contact in confined spaces with ads aboard buses and subway trains"]). Nonetheless, it's a strange notion to suggest that persons who work and live in our nation's capital would be so offended by political controversy.  Moreover, on its face, WMATA's ban on "issue-oriented" advertising wouldn't ban ads selling condoms, for example, regardless of how controversial or offensive that ad might be to its ridership.  In short, under the circumstances, the restriction is content based and unreasonable.

offend a hostile mob"); *Hill*, 530 U.S. at 715 & 710, n.7 ("The fact that the messages conveyed by [the signs] may be offensive to their recipients does not deprive them of constitutional protection.").

Indeed, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975). Rather than censoring the speaker, the burden rests with the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Cohen v. Cal.*, 403 U.S. 15, 21 (1971). As the *Cohen* Court noted, "[W]e cannot indulge the facile assumption that one can forbid particular words [or images, as in this case] without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of *unpopular views*." *Id.* at 26 (emphasis added). In fact, First Amendment protection even extends to prevent regulatory schemes that would allow a disapproving citizen to silence a disagreeable speaker by complaining on other, apparently neutral, grounds. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) (holding that the prohibition on knowingly communicating indecent material to minors in Internet forums was invalid because it conferred "broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old-child . . . would be present").

Thus, pursuant to the First Amendment, the government is not permitted to affirm the heckler; rather, it must protect the speaker and punish those who react lawlessly to a controversial message. As the Sixth Circuit observed, "[The government] has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he

must take reasonable action to protect . . . persons exercising their constitutional rights." *Glasson v. Louisville*, 518 F.2d 899, 906 (6th Cir. 1975); *see also Bible Believers v. Wayne Cnty.,* 805 F.3d 228 (6th Cir. 2015) (same).

Thus, WMATA cannot, consistent with the Constitution, restrict Plaintiffs' message *via* its "moratorium" and subsequent resolution because it or other viewers might find the message offensive. Otherwise, the government "would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Cohen*, 403 U.S. at 21.

In sum, WMATA's restriction on Plaintiffs' ads is content based and cannot survive strict scrutiny.

### 2.    WMATA's Speech Restriction Is Viewpoint Based.

WMATA has restricted Plaintiffs' advertisements not only on the basis of their content, which is impermissible, but on the basis of the viewpoint expressed by Plaintiffs, which is fatal. Viewpoint discrimination is an egregious form of content discrimination that is prohibited in all forums. *See Rosenberger*, 515 U.S. at 829; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (internal quotations and citation omitted); *Pitt. League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 296 (3d Cir. 2011) ("Although the parties have briefed and argued the issue, we need not tackle the forum-selection question. Regardless of whether the advertising space is a public or nonpublic forum, the coalition is entitled to relief because it has established viewpoint discrimination.").

Viewpoint discrimination occurs when, as here, the government regulates speech "because public officials oppose the speaker's view." *Perry Educ. Ass'n,* 460 U.S. at 46. Thus, the

government acts unconstitutionally *even when it adopts an apparently evenhanded rule excluding expression on its property* if it acts with a motive to discourage or suppress a particular viewpoint. *See Rosenberger,* 515 U.S. at 829 (stating that when the "rationale for the restriction" is "the specific motivating ideology or the opinion or perspective of the speaker," the government engages in forbidden viewpoint discrimination); *Cornelius,* 473 U.S. at 811 ("The existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination."); *id.* at 812 (stating that such "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view").

Moreover, even if the government does not itself possess the illicit motive, it may act unconstitutionally if it adopts, or regulates in deference to, the hostility of another party toward a particular viewpoint.  In *Air Lines Pilots Association v. Department of Aviation,* 45 F.3d 1144, 1157 (7th Cir. 1995), for example, the Seventh Circuit held that the government may not bar a speaker's message from its property solely in an effort to cater to the objections of others. Moreover, the Supreme Court warned in *Cornelius* that if the government's purported justification for excluding certain groups from its property was to quell controversy, the asserted purpose could be "in reality a facade for viewpoint-based discrimination."  *Cornelius*, 473 U.S. at 811.

Here, WMATA has a long history of accepting controversial messages for display on its advertising space.  *See, e.g., Lebron*, 749 F.2d at 893; *AFDI v. WMATA I*, 898 F. Supp. 2d 73. Consequently, there is no dispute that this forum is compatible for the type of speech at issue here (*i.e.*, Plaintiffs' ads).  *See id.; see also Ridley*, 390 F.3d at 76-77 ("As to the nature of the property, the MBTA does run advertisements and so there is nothing inherent in the property which precludes its use for <u>some</u> expressive activity.").

WMATA concedes, as it must, that "as the seat of the federal government, the D.C. market is distinct in the amount of issue oriented advertising." (SMF at ¶ 12). Yet, when Plaintiffs submitted their "Support Free Speech" advertisements, WMATA took the unprecedented step of hastily approving a "moratorium," which operated as a prior restraint, to silence Plaintiffs' message. This action is plainly the type of censorship that is in reality a facade for viewpoint-based discrimination, in violation of the First Amendment. (*See* SMF at ¶ 34 [testifying that the submission of Plaintiffs' ads was the "straw that broke the camel's back"]).

### 3. WMATA's Speech Restriction Is Unreasonable.

Finally, not only is WMATA's restriction on Plaintiffs' speech content and viewpoint based, it is unreasonable, and thus impermissible even in a nonpublic forum. *Perry Educ. Ass'n,* 460 U.S. at 46 (requiring speech restrictions in a nonpublic forum to be reasonable and viewpoint neutral). Reasonableness is evaluated "in light of the purpose of the forum and *all the surrounding circumstances.*" *Cornelius*, 473 U.S. at 809 (emphasis added); *see also Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222-23 (9th Cir. 2003) (granting a preliminarily injunction and finding that the "proffered justification" for the speech restriction was "patently unreasonable"). And the "reasonableness" requirement for speech restrictions "requires more of a showing than does the traditional rational basis test; *i.e.*, it is not the same as establishing that the regulation is rationally related to a legitimate government objective, as might be the case for the typical exercise of the government's police power. There must be evidence in the record to support a determination that the restriction *is* reasonable. That is, *there must be evidence that the restriction reasonably fulfils a legitimate need.*" *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966-67 (9th Cir. 2002) (internal quotations and citations omitted) (emphasis added). As the Third Circuit observed: "Consideration of a forum's special attributes is relevant to the constitutionality of a regulation

since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 255 (3d Cir. 1998) (block quotation and citation omitted).  Thus, "the reasonableness of the government's restriction on speech depends on the nature and purpose of the property for which it is barred." *Id*.  For example, rules limiting disruptive behavior in a library are reasonable given the nature and purpose of a library.  *See id*.  In light of the overall circumstances here, including WMATA's long history of accepting controversial ads, the nature and characteristics of the forum at issue, and the fact that the ads will appear in our nation's capital, WMATA's "moratorium" and subsequent resolution are patently unreasonable.

In *Christ's Bride*, for example, the Third Circuit concluded "that SEPTA's removal of the [anti-abortion] posters violated the First Amendment because the removal was not 'reasonable.'" *Id*.  Despite the controversial nature of the abortion issue, the court concluded that "[t]he subject of the speech, and the manner in which it was presented, were compatible with the purposes of the forum," noting that "the government has offered no basis on which to conclude that the speech in question would interfere with the accepted purposes of the advertising space."  *Id*. at 256.

In *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611 (E.D. Pa. 2014), the court held that the prohibition on non-commercial ads at the Philadelphia International Airport—a nonpublic forum—was "unreasonable" in that displaying such ads was "perfectly compatible" with the forum, would not "diminish advertising revenue" or the airport's "efficacy," nor make the airport "a meaningfully less positive, family oriented place."  *Id.* at 630.

The adoption of a subsequent written policy prohibiting non-commercial ads at the airport was recently before the Third Circuit, and the court held it unconstitutional,[13] *see NAACP v. City*

---

[13] In *NAACP v. City of Philadelphia,* the City adopted the challenged written policy during the pendency of

*of Phila.*, No. 15-1002, 2016 U.S. App. LEXIS 15431 (3d Cir. Aug. 23, 2016), further demonstrating that, contrary to WMATA's position, the government does <u>*not*</u> have plenary authority to simply shut down a forum to non-commercial speech, even when the forum is a nonpublic forum to begin with, as in *NAACP*.  Indeed, in the current case, the situation is far worse for WMATA because the forum was unquestionably a public forum at the time Plaintiffs' ads were submitted, *AFDI v. WMATA I*, 898 F. Supp. 2d at 78-79 (concluding that WMATA "provides a public forum for advertising"), and there is no dispute that Plaintiffs' ads are compatible with this forum (*i.e.*, there is nothing "incompatible" with displaying noncommercial ads on WMATA's buses or subway dioramas).  (*See, e.g.,* SMF at ¶ 32 [conceding that at the time Plaintiffs' ads were submitted, there was "no reason to reject" them]).  In fact, WMATA has previously displayed Plaintiffs' ads on their property, and these ads generated $65,200 in much needed revenue for the transit authority.  (SMF at ¶ 16; *see also* SMF at ¶ 13 [revenue from issue-oriented ads]).

Thus, the reasoning in these cases is true here in spades: It is unreasonable to argue that an ad displayed on the outside of a bus traveling through Washington, D.C.—a bustling city in which passengers and outside observers are besieged by a cacophony of expressive, and quite often political and controversial, media—would somehow interfere with the operation of WMATA's bus system.  *See Cohen*, 403 U.S. at 21 (noting that viewers "could effectively avoid further bombardment of their sensibilities simply by averting their eyes").  Indeed, for decades WMATA has displayed controversial, public-issue advertisements.  And, as WMATA concedes, since D.C. is the seat of our federal government, its "market is distinct in the amount of issue oriented

---

the litigation.  The NAACP filed an amended complaint to challenge the written policy.  However, that was done after the City agreed to display the NAACP's ad for three months and to pay the organization $8,800 in attorneys' fees.  *See NAACP*, 2016 U.S. App. LEXIS 15431, at *4.  Here, Plaintiffs are not opposed to amending their Complaint in light of the resolution that was approved while this case was pending.  However, as noted previously, Plaintiffs do not believe this is necessary because the resolution is part of the ongoing harm, and WMATA itself has put the resolution at issue.

advertising" (SMF at ¶ 12)—meaning, WMATA's advertising space (unlike any other transit authority in the country) is the *very* place these types of ads should be displayed.

In the final analysis, the display of advertisements like those at issue here is perfectly compatible with the forum. The *manner* in which the speech is presented (displays on buses or dioramas) is also compatible with the purpose of the forum. And finally, Plaintiffs will pay the required fees to run their ads, thus *promoting* WMATA's revenue raising purposes. Given WMATA's revenue shortcomings (*see* SMF at ¶ 15 [testifying that on an annual basis, WMATA is not profitable]), it is unreasonable to reject this revenue source under the circumstances. In short, even if the Court were to conclude that the forum was properly converted from a public to a nonpublic forum, the restriction on Plaintiffs' advertisements is simply unreasonable and thus violates the First Amendment. As a result, Plaintiffs are entitled to judgment as a matter of law.

## IV.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR EQUAL PROTECTION CLAIM.

The relevant principle of law was articulated by the Supreme Court in *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92 (1972). In *Mosley*, the Court struck down a city ordinance that prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute. The Court stated, "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id*. at 96.

This principle of law is transcendent, and by its express terms it applies to the situation presented here: The government (WMATA) has granted the use of a forum (its advertising space) for certain speakers (those who want to express a "commercial" message), but denied this same

forum to speakers (Plaintiffs) whose messages ("issue-oriented") the government finds unacceptable.

As *Mosley* makes clear, such discrimination not only violates the Free Speech Clause of the First Amendment, it also violates the Equal Protection Clause of the Fourteenth Amendment. *See also Carey v. Brown*, 447 U.S. at 461-62; *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) ("The Equal Protection Clause was intended as a restriction on [government] action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that disadvantage a "suspect class," *or that impinge upon the exercise of a 'fundamental right*.'"") (emphasis added). As a result, Plaintiffs are entitled to judgment as a matter of law.

## V.  PLAINTIFFS CLAIMS FOR PROSPECTIVE DECLARATORY AND INJUNCTIVE RELIEF ARE NOT MOOT.

The U.S. Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" sufficient to justify injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also N.Y. Magazine,* 136 F.3d at 127 (upon establishing a violation of the First Amendment, the plaintiff "established *a fortiori* . . . irreparable injury"); *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*). Consequently, Plaintiffs have established as a matter of law that they have suffered, and will continue to suffer, irreparable harm absent the requested injunction.

WMATA argues that the "moratorium" and subsequent resolution modifying its advertising guidelines moot this case. (Defs.' Mem. at 4-7). WMATA is mistaken.

The Supreme Court has long recognized that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). As the Court noted, not only is a defendant "free to return to his old ways," but also the public has an interest "in having the legality of the practices settled." *Id.* at 632; *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways.") (alterations and quotation marks omitted). Moreover, "[a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W. T. Grant Co.*, 345 U.S. at 633. In fact, the Court warned the lower courts to be particularly vigilant in cases such as this, stating, "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform . . ." *Id.* at 632 n.5.

In *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 662 (1993), the Supreme Court refused to hold the controversy moot "because changes of the law were alleged to inflict the same injuries but only to a lesser extent." As stated by the Supreme Court, the rule that the voluntary cessation of illegal conduct will not deprive a tribunal of its jurisdiction to decide a claim is "well settled." Here is what the Court had to say about this "well settled" rule:

> In their brief on the merits, respondents reassert their claim that the repeal of the challenged ordinance renders the case moot. We decline to disturb our earlier ruling, however; now, as then, the mootness question is controlled by *City of Mesquite v. Aladdin s Castle, Inc.*, 455 U.S. 283, 71 L. Ed. 2d 152, 102 S. Ct. 1070 (1982), where we applied the "well settled" rule that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.*, at 289. Although the challenged statutory language at issue in *City of Mesquite* had been eliminated while the case was pending in the Court of Appeals, we held that the case was not moot, because the defendant's "repeal of the objectionable language would not preclude it from

reenacting precisely the same provision if the District Court's judgment were vacated." *Ibid.*

This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. *Nor does it matter that the new ordinance differs in certain respects from the old one. City of Mesquite* does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. *The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts.* The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors—and, in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—*it disadvantages them in the same fundamental way.*

*Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 661-62 (emphasis added).

Here, the "moratorium" and subsequent resolution inflict the very same injury—WMATA has targeted Plaintiffs' speech for censorship using a prior restraint, which is the gravamen of Plaintiffs' complaint. And as noted above, the timing of the "moratorium" and the hasty way in which it was passed plainly show that it was designed to prevent Plaintiffs from running their ads. As noted by the Supreme Court, such changes do not moot the controversy. Indeed, under the circumstances here—which include WMATA's history of unlawfully restricting Plaintiffs' speech, the timing of the "moratorium," and the refusal by WMATA to accept Plaintiffs' ads upon submission—it would be improper to deny injunctive relief on mootness grounds. *See, e.g., People Against Police Violence v. City of Pitt.*, 520 F.3d 226, 231 (3d Cir. 2008) (holding that "neither the City's initial representation that it would no longer enforce Chapter 603 nor its formal repeal of that ordinance a few months later deprived the District Court of jurisdiction" and considering, *inter alia*, the allegedly "long history of unconstitutional conduct under the ordinance").

And while the Second Circuit in *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, 815 F.3d 105 (2d Cir. 2016), held that the MTA had met its "heavy

burden" of demonstrating mootness for purposes of injunctive relief, the facts of that case are readily distinguishable.  Here is what the Second Circuit said regarding the issue:

> [E]ven if the MTA had an incentive to revert to its old advertising standards and permit advertisements that are "political in nature," as AFDI argues is the case, there would still be no reasonable expectation that the MTA would return to its past practice of applying the incitement prohibition to the Ad, which is all that the district court enjoined:  As the MTA conceded at oral argument, its failure to appeal the district court's award of nominal damages to AFDI means that the MTA is now collaterally estopped from re-litigating the constitutionality of the application of the incitement prohibition to the Ad.  In sum, the combination of the amendments to the MTA's advertising standards, the MTA's representations to this Court, and the collateral estoppel effect of the district court's partial judgment on damages compels the conclusion that there is no reasonable expectation that the MTA will again reject the Ad under the incitement prohibition.

*Id*. at 110.  No such factors or incentives are present in this case.  Indeed, based on the loss of revenue WMATA will suffer by rejecting "issue-oriented" ads, particularly in light of its financial difficulties, it is reasonable to conclude that WMATA will return to its old ways.  And there is no judgment that will have a collateral estoppel effect on WMATA.  At a minimum, WMATA cannot meet its "heavy burden" under the facts of this case; thus it would be improper to conclude that Plaintiffs' constitutional claims are moot.

WMATA's reliance on *Initiative and Referendum Institute v. United States Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012), in support of its mootness argument fares no better.  (*See* Defs.' Mem. at 6-7).  In *Initiative and Referendum Institute*, the challengers sought to enjoin the enforcement of a provision of a postal regulation as applied to *Grace* sidewalks (*i.e.,* sidewalks that are public forums), but the postal service "beat them to the punch by amending the regulation to exempt *Grace* sidewalks."  *Id*. at 1074.  The district court held the challenge moot, and the D.C. Circuit agreed, concluding as follows:

> It is implausible that the Postal Service would have gone through the cumbersome process of amending its regulation to exempt *Grace* sidewalks only to re-amend the regulation after this case is resolved to once again cover them, *especially when we*

> _have already said that it would be unconstitutional to do so_.

> Because the challenged regulation no longer applies to _Grace_ sidewalks, the amendment "completely and irrevocably eradicated the effects of the alleged violation."

_Id_. (emphasis added).  Thus, similar to the case against the MTA discussed above, in _Initiative and Referendum Institute_, the court "already said it would be unconstitutional" for the government to return to its old ways, thus supporting the government's claim of mootness.  No such factor exists here.

In sum, there are no factors present in this case similar to those in the case against the MTA or in _Initiative and Referendum Institute_ that WMATA can rely upon to satisfy its "heavy burden" to establish mootness.

## VI.   DEFENDANTS ARE LIABLE FOR VIOLATING THE CONSTITUTION.

Defendants argue in the "alternative" that they can escape liability in this action because WMATA is not a "person" under 42 U.S.C. § 1983 and its General Manager has statutory immunity.[14]  (Defs.' Mem. at 11-12).  Defendants are mistaken.

As an initial matter, Defendants do <u>not</u> argue in their moving papers that WMATA enjoys immunity, Eleventh Amendment or otherwise.  Section 80 of the Washington Metropolitan Area Transit Regulation Compact ("WMATA Compact") expressly provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function."  D.C. Code § 9-1107.01(80).  WMATA's leasing of its advertising space is a proprietary (as opposed to governmental) function.  As this Court stated in _Lebron v. Washington Metropolitan Transit Authority_, 665 F. Supp. 923, 935

---

[14] It is important to recall that this action is brought under 42 U.S.C. § 1983 _and_ the First and Fourteenth Amendments, (_see, e.g._, Compl. ¶¶ 1, 31-38 [Doc. No. 1]), and that this Court has concurrent _original_ jurisdiction over suits against WMATA, D.C. Code § 9-1107.01(81).

(D.D.C. 1987), "The rental of commercial advertising space is clearly a proprietary function. . . . Thus, WMATA, under the clear language of section 80 [of the WMATA Compact], has waived its Eleventh Amendment immunity in this case." *Lebron* was a case arising under 42 U.S.C. § 1983.  *See id*.

    With regard to Defendants' claim that WMATA is not a "person" for purposes of 42 U.S.C. § 1983, this Court in *Lebron* previously held WMATA liable for damages under § 1983.  *Lebron*, 665 F. Supp. at 936 ("[T]he Court will serve the deterrent purposes of § 1983 by requiring WMATA to compensate Lebron for all proven damages, and by awarding nominal damages for the other minimal wrongs.").  Granted, this decision was issued prior to the Supreme Court's decision in *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), and subsequent district court decisions have agreed with WMATA.[15]  Nonetheless, in light of the rationale expressed in *Will*, WMATA in this instance is not a State of the Union—it is a "person" under § 1983, just as municipalities and political subdivisions are "persons" under this statute per the Supreme Court's decision in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  In *Monell*, the Court held that the word "person" must be construed to include "bodies politic and corporate."  *Id*. at 689-90, n.53.  WMATA fits this definition.

    In *Will*, the Court held that States were not "persons."  In doing so, the Court considered the Eleventh Amendment, noted that "it is an established principle of jurisprudence that the sovereign cannot be sued in its own courts without its consent," and stated that "[w]e cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from

---

[15] *See Lucero-Nelson v. Wash. Metro. Area Transit Auth*., 1 F. Supp. 2d 1, 7 (D.D.C. 1998) (dismissing § 1983 claim against WMATA because it is not a "person" under the statute); *James v. Wash. Metro. Area Transit Auth*., 649 F. Supp. 2d 424, 429 (D. Md. 2009) (same); *Plater v. Dist. of Columbia Dep't of Transp*., 530 F. Supp. 2d 101, 104 (D.D.C. 2008) (same); *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth*., 239 F.R.D. 9, 20 (D.D.C. 2006) (same); *Headen v. Wash. Metro. Area Transit Auth*., 741 F. Supp. 2d 289, 294 (D.D.C. 2010) (same).

being sued without its consent." *Will*, 492 U.S. at 67 (internal quotations and citation omitted). The Court further noted that "[t]he legislative history of § 1983 does not suggest a different conclusion," *id*. at 68, finding "nothing substantial in the legislative history that leads us to believe that Congress intended that the word 'person' in § 1983 included the States of the Union." *Id*. at 69.  The Court concluded that "*Monell* itself is not to the contrary." *Id*. at 70.  The Court stated that "it does not follow that if municipalities are persons then so are States.  States are protected by the Eleventh Amendment while municipalities are not, and we consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes.'" *Id*. (quoting *Monell*, 436 U.S. at 690, n.54).

WMATA is a unique entity—it is not a State of the Union.  It has substantial corporate and municipal characteristics that make it more like a local governmental unit or political subdivision than an arm of state government, particularly with regard to the activities at issue—activities for which there is no Eleventh Amendment immunity.  As noted, the display of ads is a proprietary and not a governmental function.  And it should be noted as well that the proposed ads are intended for display in Washington, D.C. and not in any of the signatory states.  Moreover, an award of nominal damages for the past loss of Plaintiffs' constitutional rights[16] can come from ad revenue—not from any state treasury.  Nonetheless, an award of $1 in damages—the only damages at issue here—does no harm to a state treasury.  Moreover, attorneys' fees may be awarded under 42 U.S.C. § 1988 (the same fee-shifting provision that applies for violating § 1983) for violating civil rights even if paid out of the state treasury.  *Mo. v. Jenkins*, 491 U.S. 274, 279 (1989) (upholding fee award under § 1988 and stating that "it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment.").

---

[16] *See Carey*, 435 U.S. at 266-67 (awarding nominal damages for the violation of constitutional rights as a matter of law).

In short, Eleventh Amendment immunity has *not* been extended to the acts at issue here. D.C. Code § 9-1107.01(80).  And Congress gave the federal courts concurrent *original* jurisdiction over the claims advanced in this case (*i.e.*, WMATA has consented to being sued in this Court). D.C. Code § 9-1107.01(81).  Thus, a claim against WMATA under § 1983 is appropriate.

The tension between these two positions (WMATA's Eleventh Amendment immunity from suit and WMATA's liability under § 1983) is illustrated by two cases cited by both parties. In *Lebron v. Washington Metropolitan Area Transit Authority,* 749 F.2d 893 (D.C. Cir. 1984), the court, through the opinion of Circuit Judge Bork (then-Circuit Judge Scalia was on the panel as well), held that WMATA violated the plaintiff's rights under the First Amendment by refusing to display his advertisement.  There was no conclusion that WMATA was free from liability on any grounds.  And as noted previously, the plaintiff's claim was advanced pursuant to 42 U.S.C. § 1983.  *Lebron*, 665 F. Supp. at 936 (permitting damages under § 1983).

In *Morris v. Washington Metropolitan Area Transit Authority*, 781 F.2d 218 (D.C. Cir. 1986), the court, once again through the opinion of Circuit Judge Bork (then-Circuit Judge Scalia was on this panel as well), reviewed in detail WMATA's limited sovereign immunity and concluded that this immunity prevented liability from attaching in this § 1983 case.

The point Plaintiffs are making here is this: WMATA is unique.  It is not a State.  It is the creature of a compact that was principally created by Congress.[17]  *See id.* at 222.  It is a government

---

[17] As stated in *Morris*:

> Congress played a particularly active role in creating WMATA.  Notably, Congress, not the states, initiated the WMATA Compact. . . .  The Constitution grants Congress the power "to exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]."  U.S. Const. art. I, § 8, cl. 17. Pursuant to this power, Congress "adopted and enacted" the WMATA Compact for the District of Columbia. . . .  Congress also gave its consent to Maryland and Virginia to enter into the WMATA Compact, as required by U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State. . . .").

*Morris*, 781 F.2d at 222 (internal citations omitted).

agency (*i.e.*, it is not a private actor), so the Constitution applies. Congress did not expressly exempt WMATA from § 1983 liability, and, indeed, gave the federal courts concurrent original jurisdiction over claims advanced against the transit authority. The extension of the state's Eleventh Amendment immunity here only goes so far—and it does not go far enough to preclude liability under the facts of *this* case (*i.e.*, exercising a proprietary function that violates the First Amendment). That is, the limited conferring by Maryland and Virginia of their immunity does not preclude a finding that WMATA is a "person" under § 1983 for purposes of this case.

Additionally, there is no basis for concluding that WMATA's General Manager should escape liability under § 1983. WMATA's immunity argument on behalf of its General Manager is based on the D.C. Code. (*See* Defs.' Mem. at 12 [citing D.C. Code § 9-1107.01(80), stating that the "exclusive remedy for . . . torts for which the Authority shall be liable . . . shall be by suit against the Authority"]). Under Defendants' theory, WMATA and its officials could violate the Constitution with impunity since they could never be held liable: WMATA would have immunity under the Eleventh Amendment and be exempt under 42 U.S.C. § 1983, and WMATA's officials would have statutory immunity. How could anyone sue WMATA for violating their constitutional rights under this scheme?

Nonetheless, regardless of Defendants' assertion of statutory immunity for WMATA's General Manager, under *Ex Parte Young*, 209 U.S. 123 (1908), prospective injunctive relief against state officials for violating the Constitution provides an exception, and such claims may be advanced under 42 U.S.C. § 1983, *see Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."). And because Plaintiffs' claims for prospective relief are not moot, as discussed above, judgment can

and should be entered against WMATA's General Manager for violating Plaintiffs' rights secured by the Constitution.

## CONCLUSION

For the foregoing reasons, the Court should deny WMATA's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (DC Bar No. 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
david.yerushalmi@verizon.net
Tel: (646) 262-0500
Fax: (801) 760-3901

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.